SCOTT *et al. v.* STATE OF GEORGIA.

SIMMONS, J.—There was no error in overruling this motion for a new trial. The jury found the defendants guilty, the trial judge was satisfied with their verdict, and we are not disposed to interfere with his judgment. *Judgment affirmed.*

November 6, 1889.

Criminal law. Robbery. Verdict. New trial. Before Judge RICHARD H. CLARK. Dekalb superior court. February term, 1889.

Green and Jim Scott were indicted and tried for robbery. The evidence tended to show that Robert Bond, between half past seven and eight o'clock, on the night of December 7, which was Friday night, while on his way to his home from his store, in a dark place of a road not far from where defendants lived, was set upon with sticks by two negroes, and was beaten and robbed. The night was a cloudy moonlight night, so that he could not distinguish the faces of the negroes, but in size, height and color they corresponded precisely with defendants. He was robbed of a sack which contained $20 or $25, principally in dimes, quarters and nickels, one or two halves, and perhaps as many as two silver dollars, which he had taken out of the drawer at his store to carry to his home. After he was robbed, he reached his home at about eight o'clock. About seven o'clock of the same evening, the defendants were at his store. A younger brother of theirs was an employé of Bond, and just before Bond closed his store, about half past seven o'clock, this younger brother saw Bond take up a pistol and put it back in a drawer in the store. Sticks were found at the place of the robbery, which were testified to be wagon-standards from a wagon frame which had been left just by the side of a path that defendants usually traveled from the house they lived in with their mother. There was blood and hair on the sticks when they were picked up. The path was little used except by defendants and other tenants of their mother's landlord and their visitors. On the morning before the robbery, the defendants and their mother came into Bond's store and the mother asked him to credit her for about 75 cents worth of goods, which he refused to let her have. Their younger brother, John, when Bond was counting out his cash at the store on the night of the robbery, was standing where he could see Bond do it. Defendants' mother rented a house from one Nunnally, and was behind with her rent. The defendants

were employed by a granite company, and were paid off every two weeks. There were pay-days on the 5th of December and 22d of November, and Green Scott was paid $5 on the latter day and probably on the former also. It was customary where as much as $5 was due a hand to pay him that sum in a bill, and any small excess in silver or nickles. On the day after the robbery, Green Scott paid one Johnson $2.65 in silver on a debt which he had owed Johnson some time, and on which, about a month before, he had paid $3 ; also traded to the extent of about eighty-five cents or a dollar at Johnson's store, purchased a trunk on credit, and paid fifty cents for a pair of shoes he had bought about two weeks before. These payments were made in small silver change. On the same day, he traded with one Simmons to the extent of $7.50, paying a two dollar bill and the balance in silver quarters and dimes. On the night of the same day. Jim Scott traded with one Tribble and paid him $1.05 in dimes and nickles. On the same day, both defendants traded with one Evans to the extent of 50 cents, in small change; and their mother paid one Ragan for a load of wood, in nickles, dimes and quarters, which money had been due for two or three months. Defendants had told Ragan the week before that they would pay him or leave the money with their mother on the day when the payment was made. A considerable quantity of nickles, dimes and quarters were distributed in the neighborhood in which the robbery occurred, by payments of its hands by the granite company. On Sunday after the robbery, one Roseberry hired to Jim Scott a buggy and horse, for which Jim paid him four quarters and two halves. About the time of the robbery, persons were heard running from the direction where the robbery occurred in the direction of where the defendants lived.

The evidence introduced by the defendants and their statements tended to show that they were home at the

time the robbery occurred, and had nothing to do with it; and that they had money in their possession sufficient to account for the various payments made by them, except as to the Roseberry payment, which it was denied that they made at all; though a witness who testified for them as to their possession of a considerable amount of mony, as much as $19, was confused and contradictory in her statements, and it was shown that she had been a witness at the committing trial of the defendants and had delivered no such testimony there. She said it was because she was not then questioned upon this point; but the defendants made no such defence at the committing trial as that they had had money in the hands of this woman.

There was a verdict of guilty as to both defendants. They moved for a new trial on the grounds that the verdict was contrary to law and evidence; the motion was overruled, and they excepted.

J. A. WIMPY, for plaintiffs in error.

J. S. CANDLER, solicitor-general, for the State.